# FRANCES H. FLINN, Appellant v. MECHANICS BUILDING ASSOCIATION, Respondent.

## St. Louis Court of Appeals, April 1, 1902.

1. **Association, Mechanics Building: USURY: VOLUNTARY PAYMENT: STATUTORY CONSTRUCTION.** A debtor can not recover by suit, usurious interest voluntarily paid, notwithstanding sections 3709 and 3710, Revised Statutes 1899, *provide* that upon proof of usurious interest in excess of legal interest, the same shall be credited on the debt, and invalidate chattel mortgages, pledges and liens securing the indebtedness calling for usurious interest.

2. ———: ———: **USURIOUS INTEREST: DURESS: EVIDENCE.** Evidence to recover money paid as usurious interest in settlement of a debt to a building and loan association, did not show that defendant threatened to sell the property mortgaged; *Held*, not to show duress in such payment that would authorize a recovery of the sum paid.

Appeal from Hannibal Common Pleas.—*Hon. David H. Eby,* Judge.

AFFIRMED.

*John L. RoBards* for appellant.

The lawful rate of interest agreed in the bond to be paid on the loan was six per cent per annum, payable monthly; and for all monthly payments made by appellant, she was entitled, as was testified by the secretary of respondent, to have credited for the average time with the interest thereon at the agreed rate on the loan by the respondent, a solvent, going concern, and title thereto, could only be acquired by such application and the excess appellant is entitled to recover.

Strohen v. Franklin Sav. & L. Assn., 115 Pa. St. 273; Sess. Acts, 1891, p. 169; Loan Co. v. Stone, 46 S. W. 67. (2) "The plaintiff has a right to have this sum of $8.08 credited properly on the debt, if it was usurious." Ferguson v. Soden, 111 Mo. 208; Bank v. Miller, 73 Mo. 187; Bank v. Slemmons, 34 Ohio St. 142; Edinger v. Mo. Guar. S. & B. Assn., 83 Mo. App. 615. (3) "If said premium should be fixed by a rule of the association or by any other manner than as the statute provides, then it was an illegal charge and usurious, and should be credited as a payment on the stockholder's loan." Price v. Empire Loan Assn., 75 Mo. 551; Vandergrift v. Swinney, 158 Mo. 527. (4) "All in excess of that rate is money paid to him, is money received by him in violation of law, to which he has no legal right, and which the other party is entitled to recover back, in an action of assumpsit, as money had and received to his use. Williar v. The Baltimore Butchers L. & A. A., 3 Law & Eq. Rep. 410-13. (5) The moment usurious interest is taken, the right·of the debtor to have the same credited on the principal is vested by express statute. The application is then made and the debt *pro tanto* reduced. "The law considers the borrower rather as a victim than an aggressor. The statute prohibits usury, in order to protect needy and necessitous persons from the oppression of usurers, who are eager to take advantage of the distresses of others, who violate the law to take advantage of their ruin. In such case the maxim *potior est conditio defendentis* has never been applied. Wheaton v. Hibbard, 20 Johns. 293. (6) She was unable to give bond to enjoin the sale. "The case here is that the defendant held the plaintiff by the wrists. . . . He was practically confronted with the question whether or not he should pay the defendants the amount exacted or suffer the serious consequences to be reasonably apprehended by a refusal to do so. The payment under such circumstances, it seems to us, would be under an urgent necessity, under a kind of moral duress. Duress may be shown

with respect to real property as well as personal, so as to render payment on account of it involuntarily and permit it to be recovered back." Wells v. Adams, 88 Mo. App. 215; Longmire v. Ogilvie, 49 Minn. 564; Pemberton v. Williams, 87 Ill. 15; White v. Hazelman, 34 Pa. St. 142; Meredith v. Meredith, 79 Mo. 636; Hensenger v. Dyer, 147 Mo. 219. (7) "Where money is wrongfully and illegally exacted it is received without any legal right or authority to receive it, and the law at the very time of payment creates the obligation to refund it. A notice to recover back the money does not even in such cases create the right to recover it back; that results from the illegal exaction of it." Bank v. Bank, 31 U. S. 8. (8) "To make the payment a voluntary one the parties should stand upon an equal footing." Close v. Phipps, 7 M. & Gr. 586; Parker v. Railroad, 7 M. & Gr. 252; Wilkerson v. Hood, 65 Mo. App. 491-4.

*Thomas H. Bacon* for respondent.

(1) The mortgage executed February 27, 1890, is not void for usury. Thompson on Building Ass'n (2 Ed. 1899), p. 520, sec. 259. Neither is the note void for usury. Montarry v. Rock, 10 Mo. 506; Ferguson v. Soden, 111 Mo. 208. In Missouri, usury avoids only *pro tanto* to amount of usury. It imparts no gangrenous infirmity to the remainder of the contract. The deal does not collapse. The contract is not revolutionized. Neither will the court treat the contract as a wreck and save only such features as are favorable to the borrower or favorable to the stockholder, and repudiate every feature favorable to the association. Payments on the shares of stock are not payments on the loan. Brown v. Archer, 62 Mo. App. 277; Sappington v. Loan, etc., 76 Mo. App. 242; Thompson on Building Associations (2 Ed. 1899), p. 428, sec. 210. "The borrower's liability on his stock and his liability on his loan being different, payments on his stock

are not *ipso facto* payments on the mortgage debt or loan." "In order to effectuate an application of such payments an election is required by some party entitled to it. Such payments are not to be treated as partial payments." Tilley v. American, etc., 52 Fed. Rep. 619; Seibel v. Victoria, etc., 43 Ohio St. 71. "Where a loan is made by an association on a pledge of its own shares the statutory rule for computing interest on partial payments has no application to the monthly dues paid on the shares so pledged and such payments do not bear interest or in any way reduce the amount on which interest is to be paid." There was no evidence whatever tending to prove duress. According to plaintiff's account the secretary plied by hypothetical questions, was beguiled or decoyed into a hypothetical answer that, on the contingency named, "the law must take its course." This was no threat, and even if it were a threat, a threat of the law is never duress. Wolfe v. Marshall, 52 Mo. 167; Dausch v. Crane, 109 Mo. 323; Robins v. Latham, 134 Mo. —; Morgan v. Joy, 121 Mo. 677.

GOODE, J.—The appellant, Frances H. Flinn, sued to recover the sum of twelve hundred and sixty-five dollars and thirty cents, alleged to have been unlawfully exacted from her by the respondent as nominally, premiums, but in fact usurious interest on a loan made to her by the respondent in February, 1890. The sum really in controversy is eight hundred and eleven dollars and seventy cents, which appellant claims was extorted from her by a threat to foreclose a deed of trust given on her property to secure the loan after she had paid the full amount she had borrowed, together with all legal charges thereon.

In our opinion, the disposition of this appeal depends entirely on whether appellant paid the sum of money last mentioned voluntarily, or under circumstances which constituted duress; not that we hold she did not owe any part of the

sum, or that all of it consisted of usurious interest for lack of competitive bidding to fix the premium when the loan was made; but because we are of the opinion that whatever portion of it was usury can not be recovered if it was paid voluntarily. Ransom v. Hays, 39 Mo. 445; Kirkpatrick v. Smith, 55 Mo. 389; Peters v. Lowenstein, 44 Mo. App. (St. L.) 406. That was unquestionably the law of this State prior to the enactment of the statute of 1891 (R. S. 1899, secs. 3709, 3710) but appellant claims that statute changed the rule. It did change it so far as it undertook to; that is, to the extent of providing that usurious interest which has been paid shall be credited on the principal debt, when usury is pleaded as a defense to an action, so that the creditor may recover judgment for no more than the amount due on the principal debt with legal interest after deducting therefrom all usurious payments. The statute further provides that in an action for the enforcement of a lien on personal property pledged or mortgaged to secure indebtedness, or, in a case where the validity of such a lien is drawn in question, proof that the party holding the lien has received or exacted usurious interest renders the lien void.

Neither of those provisions reaches this case or enables a party to voluntarily pay usury and thereafter maintain an action to recover back the money paid, but leaves that matter as it was before; wherefore a debtor from whom a creditor seeks to collect usurious interest must resist the attempt and in default of so doing, has no standing to get back his money unless he is excused from resisting payment because of duress.

The question then is, was the money which appellant seeks to recover extorted from her by the respondent by conduct and under circumstances which amounted to duress? There may be such duress of property or goods as will entitle a person, thereby coerced into making payment, to reimbursement, as where an owner is compelled to yield to an extortion-

ate demand to obtain possession of his property. Wilkerson v. Hood, 65 Mo. App. (St. L.) 491. But the circumstances under which appellant paid this money as testified to by herself, do not lend the slightest countenance to the notion that she was duressed or coerced; but on the other hand show a purely voluntary payment.

As this is the pivotal point of the case, her version of the affair is the best means of deciding it and had better be given, together with some preliminary statements. She was a music teacher in the city of Hannibal, and had been paying rent for a long while, and desiring to purchase a home at a moderate cost and near the business part of the city, she applied to Llewellyn W. Boswell, who is a lawyer and real estate agent, and also secretary of the Mechanics Building Association, to find her such a property. Thereafter he submitted a proposition to sell her a home at about the cost she desired, owned by Mrs. Mary J. Rhodes. Appellant had but little money to pay on the purchase price and Boswell suggested to her that she pay two hundred dollars in cash and borrow the balance from the building association.

It should be stated that this controversy is one of many growing out of the failure of building associations to mature their stock as soon as their officers and stockholders expected.

Mrs. Flinn claims that Boswell represented to her that she would only have to pay eight years on her loan, by which time her stock would be paid up—that he made that statement over and over again and she relied on it and borrowed from the company on the faith of it. Boswell told her that she would have to take stock in the company and bid not less than twenty-five per cent premium to get the loan of nineteen hundred dollars.

Here is what she says as to that:

"A. He said with regard to the premium, that I would be obliged to bid twenty-five per cent of $1,900. I said, 'I

want to know what that means ?' I had never heard of the premium before. He said that every one who borrowed money of the building association was obliged to pay a premium of twenty-five per cent of their loan, and I then refused to go any farther. I said, 'Well, if I have got to do that, I will not go any farther.' 'Well,' he says, 'If you are not willing to do so, you might as well stop right here.' Then I realized that there were other people in building associations who thought it was a good investment.

"Q. Never mind about your opinion—just state the facts.

"A. I said then, 'How am I to bid that?' He said, 'You should go to a meeting of the directors and bid it in yourself.' I said, 'Where do the directors meet?' He said that they met in a down-town office, and he mentioned the office (I have forgotten where it is) but he says, 'If you want, I can bid it in your name,' and I asked in regard to the amount. I said, 'Must I bid twenty-five per cent?' He said, 'No one gets a dollar of the building association for less than twenty-five per cent premium.' After talking it over I decided to do it and gave Mr. Boswell power to bid for me the twenty-five per cent which he said was called for."

She authorized Boswell to make the bid for her, he telling her that she would have to give a note for twenty-five hundred and thirty-five dollars in order to get the nineteen hundred dollars in cash which she desired. The loan was duly made, although she claims an excessive charge was exacted at the time, a contention not made good by the proof and not important to be considered now. She paid on the loan for eight years or thereabouts and then concluded that she had paid enough to entitle her to have her note returned and the deed of trust cancelled according to the aforesaid statement she claims Boswell made to her, that she would only have to pay for eight years. When she investigated the matter, the company claimed she still owed eight hundred and eleven dollars,

which sum she paid, and the question is whether this payment was voluntary or under duress?

Here is her testimony on the subject which we will set out rather fully because of its importance:

"A. . . . I paid during those nine months still my $25.70, and when at the end of that month I made up my mind that I must pay out, and I had in the meantime spoken to two of the directors beside Mr. Boswell. One of them said 'Oh, it might run fifteen years or longer than that for all we know.' So I felt the only way for me was to pay out. I asked Mr. Boswell for the amount when I paid the June, 1898, payment. It seems it was the 17th.

"Q. What date did you make the final payment?

"A. I suppose it was the 17th or a day or two before because it was the 17th the card is dated and he said he would have to look it up. My book will show.

"Q. I will just suggest that June 30 is the time and there is no controversy about that?

"A. I asked him then to tell me again how much I had to pay. I had paid for nine months, $225, and he sent me that card saying I had yet to pay $811. I had paid on the $986, $225 and yet had $811 to pay, and I borrowed the money the next day and paid it; not because for a moment I felt it was just. I felt it was only, as I remarked to every single one that I have spoken to on this subject, legalized robbery. I have paid over $3,200, and I borrowed $1,900.

"Q. Did you have an interview with Mr. Boswell, the secretary of the defendant, at his office, with relation to what would be the action of the defendant if you ceased to make any further payments, and if so, just state what it was?

"A. Yes; at the time that I paid out my eight years, I said, 'Well, suppose I don't pay anything more, what will you do?' He says, 'I shall have to charge you up fines.' I says 'What are the fines?' (I had never been behind a payment). He says, 'fifty cents a month for each share.' That

would be $6.50 each month and added to my $25.70 would make a very good bill, and it would run on, as he said for six months and then, as he said, tossing his head, 'The law must take its course,' which you know I understood, knowing that he held my mortgage with power of sale, he could sell my home from me at any time and I had no reason to think he would not do it and gladly.

"Q. Did that interview with Mr. Boswell cause you to make this payment?

"A. Yes, sir; it did. It made me feel that my only safety from everlasting payments or from losing my place rested on that, as from two of the members I received the information that it might run fifteen years or even longer, they didn't know.

"Q. I will ask you if all the payments that you made to the defendant were made to apply on the principal and interest of this $1,900 loan?

"A. Everything, and they are all regularly indorsed there in the book.

"Q. I will ask you if you willingly made the payment of June 30, 1898, when you paid off the loan?

"A. Never, for one moment. It was only a choice between evils, I thought; only to get away from where I could be fined or sold out.

"Q. Did you ask the defendant for a release of your property before you made this last payment, and if so, state what you did.

"A. I said to him, 'I have paid my full payments just as you said they should be, and now I want my papers.

"Q. Well, did he give them to you?

"A. Oh, no; he said it was not paid out and he didn't know when it would be.

"Q. Well, did the defendant refuse at that time to release your property?

"A. Why, certainly, unless I paid this amount named on the postal card; in that case he would release the property.

"Q. I will ask you this question; if you, at any time intended to ratify or approve any irregular or unlawful act of the defendant?

"A. I never at any time. I knew very well that I never for a moment did anything but say that the thing was wrong from beginning to end, and that though I paid it, I paid it under protest.

"Q. Your answer is with reference to matters that occurred subsequent to September and in September?

"A. Yes, sir; entirely.

"Q. I will repeat the question and localize the time. Did you at any time in negotiating, or at the time of the purchase, or when Mr. Boswell brought any papers to your residence to sign in 1890, intend by ratifying or approving—

"Q. With reference to the transaction of the loan and the bidding off of the premium and when you signed the bond and deed of trust, did you intend to ratify and approve any irregular or unlawful act of the defendant?

"A. No; I did not. I supposed that in signing those papers, I signed them just exactly according to agreement, not only according to agreement, but as everyone else did, I gave Mr. Boswell permission to bid for me twenty-five per cent of $1,900 and I didn't look at the papers close enough to find that instead of bidding that, he bid thirty-three per cent of $1,900, a sum which I never would have bid. They call it, I believe, twenty-five per cent of the gross sum which is a very different thing from twenty-five per cent of the $1,900. That was one point that I didn't understand, but I supposed that my papers were made out just as the papers should be, the deeds and all, and as I say, I didn't understand them when I read them. I was in a hurry and signed them because I supposed they were just as Mr. Boswell said they were—straight and right."

Boswell and the other officers of the association testified that the payment was entirely voluntary on the appellant's part, for instead of threatening to sell her property or foreclose the mortgage in any way, they did not want the loan paid, since the appellant was prompt with her monthly dues and it was to the interest of the association to have it run.

Boswell says:

"Q.   State whether you ever demanded that sum of the plaintiff?

"A.   Never, no, sir; we didn't want it.   We would rather have had the loan continued.

"Q.   State whether you ever told Mrs. Flinn that you would foreclose, or that the company would foreclose that mortgage?

"A.   No, sir; from the very fact that we had no occasion to.   She never made default in any of her payments and had lived up to her contract up to that time and we had no right or reason to say we would make a foreclosure. We would have been glad to have it continue if she had wanted to."

In our judgment, plaintiff's own testimony shows beyond all doubt that this payment was wholly voluntary and made simply to get her property released from the lien of the deed of trust; in fact, she practically says so.   She says she conversed with three of the officers of the company besides Boswell in regard to her indebtedness and one of them said the loan might run for fifteen years.   She asked Clark, a director, about it, and her conversation with him was unsatisfactory:

"Q.   When was it you asked him? (that is, as to how long the loan would have to run).

"A.   It was during this present year; I don't know just when, but it was largely my conversation with Mr. Clark that made me feel that I wanted to get away from the company. It was not a pleasant conversation.

"Q.    When were you told that your signature was necessary; that was after the transaction had been closed?

"A.    Yes, sir; with Mr. Wilson.

"Q.    It was simply telling you that in order to transfer your stock, you would have to give your signature?

"A.    Yes, sir.

"Q.    That is the way you understood it?

"A.    Yes, sir.

"Q.    You were under no coercion?

"A.    It was simply that I had got to sign that paper.

"Q.    You couldn't transfer without signing and that is all that was meant by its being necessary?

"A.    That was all that was meant.

"Q.    Was that conversation with Captain Chamberlain before or after this payment of $811?

"A.    It was before it.

"Q.    Then it was before June 30, 1898?

"A.    Yes, sir; it must have been because it was before I paid out.

"Q.    Do you correct your answer then? You told Judge Bacon it was since June, 1898?

"A.    Yes, sir; I do.   I was wrong.   It was before I paid out, but it was after I had made up my mind that I would."

It is impossible to hold the payment made under the circumstances above related was induced by coercion or compulsion amounting to duress; for appellant was not even threatened with a sale of her property.   Morgan v. Joy, 121 Mo. 677.

The judgment is affirmed.   *Bland, P. J.,* and *Barclay, J.,* concur.