KENEFICK and HAMMOND, Doing Business as a Copartnership Under Firm Name of KENEFICK-HAMMOND COMPANY, v. NORWICH UNION FIRE INSURANCE SOCIETY, Appellant.

**Division One, June 29, 1907.**

1. **FIRE INSURANCE: Explosives.** Where the policy provided that "this entire policy, unless otherwise provided by agreement endorsed thereon or attached thereto, shall be void . . . if the hazard be increased by any means within the control or knowledge of the insured, or if . . . there be used, kept or allowed on the premises . . . gunpowder exceeding twenty-five pounds in quantity, naphtha, nitroglycerine or other explosives," and nitroglycerine, dynamite, etc., were stored in the building without the knowledge of the company or its agent, the insured cannot recover, whether the fire originated from explosives temporarily stored in the building or not.

2. ———: ———: **Material to Risk.** And even though the fire did not originate from the explosives and they did not contribute to the loss, the policy is not protected by section 7973, Revised Statutes 1899, providing that no condition in any policy shall be taken or construed as other than a mere representation unless it is material to the risk insured against. To so construe that statute would be to deny to fire insurance companies the right to limit the risk against which they may limit policies of insurance.

3. ———: ———: **Waiver.** And where no agent or officer of the company knew of the storage of the explosives in the building

mentioned in the policy and they continued therein down to the time of the fire, there is no fact or circumstance from which a waiver of the provision in the policy against keeping explosives in the building can be inferred.

4. ———: ———: In Building Insured. It does not matter whether or not the building was insured, if the policy accurately described a building in which were kept certain stocks and supplies, and covered those things "in the above-described premises." There is a distinction between goods kept "in the premises insured," and goods insured "while contained in the above-described premises."

5. ———: ———: Subtleties. The courts are relieved of subtleties and fine distinctions in construing contracts of insurance by the statute which requires them to be construed like other contracts.

6. **APPELLATE PRACTICE: Theory of Trial: Demurrer: Estoppel: Waiver.** Where both parties try a cause upon a certain theory, neither can have it considered upon another and different theory in the appellate court. But where defendant at the close of all the evidence offered a demurrer to the evidence as a whole, which the court refused and he excepted, the appellate court is required to review all the evidence heard on the trial and determine for itself whether or not there was substantial evidence to support the verdict. Defendant did not estop himself or waive his right on appeal to pursue his exception to the court's ruling on his demurrer, by asking and receiving instructions the converse of those given for plaintiff.

7. ———: ———: ———: ———: ———: Position of Parties. There is a difference between the position occupied by plaintiff and that occupied by defendant at the trial. Plaintiff selects the ground of contest, and may withdraw voluntarily. Defendant is compelled to remain in court, and if defeated on one line of defense he is not thereby estopped from assuming others. If the court erroneously denies him one of his defenses, he does not waive it by insisting on others.

8. ———: ———: ———: ———: ———: Order of Instructions. The order in which instructions are asked is of doubtful utility in arriving at ultimate justice. In strict logical sequence, if defendant contends there is no case to go to the jury he should hand up his instructions in the nature of a demurrer first, and immediately at the close of the case. But there is nothing material or vital in the mere order in which instructions are asked or passed upon. Defendant does not waive the right to have his demurrer considered by presenting it along with his other instructions designed to state the converse of plaintiff's theory of the case as contained in his instructions.

9. **INSURANCE:** Material to Risk. Tons of dynamite and other forms of explosives are material to an insurance risk, and no judge should take the opinion of a jury on the point.

10. ———: ———: Definition. It would be impossible to compress within the limits of a judicial formula what would be material to a risk under any and all circumstances. Each case must depend on its own facts.

Transferred from St. Louis Court of Appeals.

REVERSED.

*Fyke Bros., Snider & Richardson* for appellant.

(1) The court erred in giving plaintiffs' second instruction. (a) There is no evidence upon which to predicate that instruction. There is not a scintilla of evidence that defendant's agent knew at the time the policy was issued that powder, fuse caps and explosives were kept in the building covered by the policy. (b) Even if the agent knew that dynamite constituted a part of plaintiffs' supplies, it does not follow that he knew that such dangerous agencies were kept or to be kept in the building, and such knowledge does not constitute a waiver or estoppel. Fischer v. Ins. Co., 83 Fed. 807. (2) Plaintiffs' third instruction is erroneous, because, first: The fact that powder was temporarily kept in the building does not relieve plaintiffs from the effects of a violation of the contract on their part. And, second: It makes no difference whether powder contributed to the loss or not. Horner v. Ins. Co., 93 Mo. App. 111; Kyte v. Ins. Co., 21 N. E. 361; Ins. Co. v. Faires, 35 S. W. 55; Martin v. Ins. Co., 52 N. W. 534; Bayer v. Ins. Co., 83 N. W. 124; Norways v. Ins. Co., 68 N. E. 551; Faulkner v. Ins. Co., 1 Kerr 279. (3) Plaintiffs' fourth instruction is erroneous. The fact that powder, etc., was customarily kept by plaintiffs as part of their railroad supplies, can be of no importance from any standpoint, unless such supplies were customarily and usually kept in the building described in the policy, and even then to

Kenefick-Hammond Co. v. Fire Ins. Society.

hold the defendants liable would be flying in the face of the contract, which provides that such articles shall not be kept (any usage or custom of trade or manufacture to the contrary notwithstanding). The evidence shows that it was not only not customary to keep such articles, but that it was a violation of law to do so. Fisher v. Ins. Co., 83 Fed. 807; Sperry v. Ins. Co., 26 Fed. 234. (4) In arriving at its verdict the jury wholly disregarded defendant's second instruction. Payne v. Railroad, 129 Mo. 421. (5) Courts will take judicial notice of the fact that the storage of explosive fireworks in the same building increased the risk of the loss of the insured property by fire. Betther v. Ins. Co., 80 N. W. 971.

*Edward J. White* for respondents.

(1) The powder and explosives, which defendant claims forfeited the policy sued on, under the undisputed evidence that such property constituted a part of plaintiffs' "supplies," were included in and covered by the written portion of the policy, describing the property insured. All of the evidence, both of plaintiffs' witnesses and defendant's agent, was to the effect that powder and caps are a part of a railroad contractors "supplies." The written portion of the policy covers plaintiffs' "supplies, consisting of hay, grain, feed, scrapers, wagons, plows and other tools and supplies, kept in their warehouse." Both before and after the particular supplies enumerated, appears, in the written portion of the policy, the more general term "other supplies." Upon the competency of parol proof to apply the policy to the subject-matter insured, where there is doubt about its application, there can be no question. May on Ins. (2 Ed.), secs. 233, 239; Ins. Co. v. Dobbins (Tenn.), 86 S. W. 383; Archer v. Ins. Co., 43 Mo. 441; Pindar v. Ins. Co., 36 N. Y. 648; Fink v. Ins. Co., 60 Mo. App. 673; Bernard v. Ins. Co.,

27 Mo. App. 26; Springfield Laundry v. Ins. Co., 151 Mo. 90; Langford v. Ins. Co., 97 Mo. App. 79. (2) If the powder and other explosives were not included within the description of the property insured, as a part of plaintiffs' "supplies," the presence of such articles in the building, up to the time of the fire, would not work a forfeiture of the policy, as they did not contribute to or in any way affect the contingency upon which defendant's liability became absolute. Laws 1897, pp. 130, 131; secs. 7973, 7974, R. S. 1899; Chouteau v. Railroad, 122 Mo. 375; Grimes v. Reynolds, 94 Mo. App. 576; Ross v. Railroad, 111 Mo. 18. The "risk insured against" in a fire policy, is a loss by fire. Certainly, nothing is "material" to that risk, unless it, in some way or some manner, caused or effected the fire. The property was lost, by the specific cause, upon which the indemnity was payable. The risk from other causes may have been greatly increased by the insured, but unless such acts "materially affected the risk insured against," the other causes which increased the risk, would be wholly immaterial to the specific "risk insured against," which was the loss by fire. Section 7973, Revised Statutes 1899, was a part and parcel of the policy sued on (Christian v. Ins. Co., 143 Mo. 460); with its term incorporated into the policy, the violation of none of the promissory warranties or conditions subsequent, such as the clause invoked by defendant, would defeat the policy, unless the acts so promised "materially affected the risk insured against." Carp v. Ins. Co., 92 S. W. 1141, 116 Mo. App. 528; Curry v. Ins. Co., 6 Wheel. Am. C. L. 204; State v. Ebbs, 89 Mo. App. 95; Springfield v. Starke, 93 Mo. App. 70; Grimes v. Reynolds, 94 Mo. App. 576; Jenkins v. Ins. Co., 171 Mo. 381; Schuerman v. Ins. Co., 165 Mo. 652; Kern v. Ins. Co., 167 Mo. 471; Ins. Co. v. McLain, 85 S. W. 700; Ins. Co. v. Stockyards Co., 87 S. W. 287; Ins. Co. v. Catlin, 45 N. E. 255; Ins. Co. v. Witman, 32

Ill. 221; Arnold v. Ins. Co., 84 Pac. 185; Obermeyer v. Ins. Co., 43 Mo. 573; Greenleaf v. Ins. Co., 37 Mo. 25; Renshaw v. Ins. Co., 33 Mo. 394. (3) In any event, the question of whether or not the presence of the powder was "material to the risk insured against," was a question of fact for the jury to determine. Hanna v. Ins. Co., 109 Mo. App. 156; Burg Bros. v. Ins. Co., 106 Mo. App. 256; Schroeder v. Ins. Co., 46 Mo. 178; Schultz v. Ins. Co., 57 Mo. 337; May on Insurance (2 Ed.), sec. 184; Ins. Co. v. Stockyards Co. (Ky.), 87 S. W. 285. (4) As the extra-hazardous property was only temporarily in the building where the insured property was located, and it was all removed before the consummation of the loss by fire, the temporary presence of such property should not avoid the policy. Arnold v. Ins. Co., 84 Pac. 182; 2 Cooley's Briefs on Insurance, p. 1689; May on Insurance (2 Ed.), sec. 246; Ins. Co. v. Wade (Tex.), 68 S. W. 977; LaForce v. Ins. Co., 43 Mo. App. 518; Planing Mill v. Ins. Co., 59 Mo. App. 204; Fink v. Ins. Co., 60 Mo. App. 673; May on Insurance (2 Ed.), sec. 241; Obermeyer v. Ins. Co., 43 Mo. 573; Greenleaf v. Ins. Co., 37 Mo. 25; Renshaw v. Ins. Co., 33 Mo. App. 394; Schmidt v. Ins. Co., 41 Ill. 295; Putnam v. Ins. Co., 4 Fed. 753; Ins. Co. v. Lawrence, 61 Ky. 9; Ins. Co. v. Shoe Co., 80 Pa. St. 407; Hynds v. Ins. Co., 16 Barb. 119. (5) The clause invoked to avoid the policy, against the keeping or use of prohibited articles, applied only where the policy covered real estate, or "premises" and not to insurance upon personal property. Leggett v. Ins. Co., 10 Rich. L. 202; Ins. Co. v. Fulton, 80 Ga. 325; May on Insurance (2 Ed.), sec. 243. (6) The evidence of the knowledge on the part of defendant's agent, of the character of the property insured and usually kept in the wareroom where the insured property was located, amounted to such evidence of waiver of the forfeiture clauses invoked as to enable plaintiffs

to submit this issue to the jury. Appellant's agent, who wrote the policy, not only showed a thorough knowledge of what constituted a railroad contractor's "supplies," which he had insured, but he stated that he also knew that such property was in the building with the other articles enumerated in policy. A knowledge of increased risk, by the insurer's agent, is a waiver of the right to forfeit a policy for such cause. Anthony v. Ins. Co., 48 Mo. App. 65; Hamilton v. Ins. Co., 94 Mo. 353; Columbia Planing Mill v. Ins. Co., 59 Mo. App. 206.

LAMM, J.—In the St. Louis Court of Appeals, BLAND, P. J., wrote, and, with the concurrence of his learned brethren on that bench, there was handed down in this case, the following opinion (119 Mo. App. 308):

"The facts as developed at the trial are correctly set out in appellant's statement as follows:

" 'On June 2, 1903, appellant issued to respondents its policy of insurance for one thousand dollars, covering the property described in said policy as follows: "One thousand dollars on their stock of supplies consisting of hay, grain and feed, scrapers, wagons, plows and other tools and supplies kept in their warehouse; all while contained in the one and one-half story brick building with composition roof situate on lots No. 14 and 15, block No. 3, street Nos. 143-145 West Olive street, Aurora, Missouri."

" 'The respondents were railroad contractors engaged in grading a railroad some miles from Aurora. They used dynamite in blasting rock encountered in their work. They kept a powder magazine about a mile and a half or two miles from the city of Aurora, where they usually kept their powder and dynamite. They did not ordinarily keep powder or dynamite in the building described in the policy, but the building

was used to store grain, hay, plows, scrapers, and such articles while not in use, and occasionally men, in respondents' employ, were permitted to sleep in the warehouse. The building was close to the center of the city of Aurora. Under the city ordinances no one was allowed to keep within the fire limits of the city, or within one block of the public square or any schoolhouse or church, a greater quantity of blasting powder than twenty-five pounds, or a greater quantity of nitroglycerine (dynamite) than one pound. The building described in the policy was within the fire limits, and one block from the bank of Aurora, and one block from the Frisco depot.

" One Woodfill was appellant's agent at Aurora, and countersigned the policy. At the time the policy was issued no powder or explosives of any kind were stored or kept in the building, and up to that time, and until the time hereinafter mentioned, nothing of the kind had been kept or stored in said building. On the contrary, respondents had kept their explosives, except such as were in use along the line of work, in a powder magazine constructed and located for that express purpose. All merchants doing business in Aurora, who handled powder, also had powder magazines located out of the city, and it was not usual or customary for merchants in Aurora to keep or allow about their business houses in the city any explosives except in small quantities. When the policy was applied for and issued, no request was made for permission to store or keep explosives in the building, and, as before stated, no explosives were there at that time or at any time prior thereto.

" 'On September 19, 1903, a fire occurred which destroyed the building and a portion of its contents. About a week before the fire occurred Woodfill went away from Aurora and did not return until after the fire. Up to the time he left nothing had been said

to him about placing or storing dynamite or other explosives in the building, and up to the time Woodfill went away, no such articles had been kept or placed in the building. On Tuesday or Wednesday before the fire, which occurred on Saturday, the respondents stored in the building described in the policy about two tons of dynamite, twelve thousand, five hundred exploders and one thousand, five hundred caps. These explosives had been in the car on the railroad track about four days before they were put in the warehouse. Respondents were compelled (presumably by the railroad company) to take the stuff out of the cars; and put the same in the warehouse, because respondents could not get teams to haul it to their magazines and because their magazines were full.

" 'All the explosives above mentioned were in the building at the time of the fire. The appellant had no notice of such fact, nor did its agent, because he went away from the city before the dynamite was in the building and did not return until after the fire.

" 'When the fire occurred, it does not appear that any one representing respondents was about the premises. When the alarm was given the fire department went to the scene and began trying to extinguish the fire. It soon became noised around that there was powder in the building. Whereupon the populace, usually attendant upon fires, withdrew to a safer place, and the firemen began to explore for exploders, etc., and finally located the dynamite in a room which was so located that they had to chop with their axes their way to the powder, and through the heroism of the firemen who risked their lives in the work, the dynamite and other explosives were removed in time to save an explosion, which would probably have resulted in loss of life as well as great damage to property in the city.

" 'The policy contains the following provisions: "This entire policy, unless otherwise provided by

agreement indorsed hereon or added hereto, shall be void . . . if the hazard be increased by any means within the control or knowledge of the insured, . . . or if (any usage or custom of trade or manufacture to the contrary notwithstanding) there be kept, used or allowed on the above-described premises . . . gunpowder exceeding twenty-five pounds in quantity, naphtha, nitroglycerin, or other explosives.''

'' 'If the appellant had known that the dynamite and other explosives were put, kept or allowed in the building it would have cancelled the policy as quickly as possible.'

"At the close of all the evidence the defendants moved the court to instruct the jury that the plaintiffs could not recover. The court refused to give this instruction and gave instructions so declaring the law to the jury that it was so enabled to, and did, bring in a verdict for the plaintiffs for the full amount of the policy. A motion for a new trial proving of no avail, defendant appealed.

"1. That the storage of powder and other explosives mentioned in answer and.the evidence was a violation of the terms of the policy, does not admit of a doubt. The agent of appellant, who signed and delivered the policy to the plaintiffs, tried very hard to swear that he knew powder was kept in the building when he issued the policy, but, when he was pinned down to what he actually knew, it was shown that he had no such knowledge and the evidence shows that it was not usual to keep powder in the building 'described in the policy of insurance. Because the fire did not originate from the explosives temporarily stored in the building, it is contended by respondents that they did not contribute to the loss and for this reason the policy is protected by section 7973, Revised Statutes 1899, which provides—in substance—that no condition in any policy of insurance shall be taken or construed

as other than a mere representation unless it is material to the risk insured against.

"The construction the respondents would have us put upon this section is that no condition of a policy of insurance shall be construed as other than a mere representation unless it contributed to the loss. Such construction would be a perversion of both the language and meaning of the statute.

"In Dolan v. Ins. Co., 88 Mo. App. l. c. 672, Judge ELLISON, of the Kansas City Court of Appeals, in respect to this section said: 'This statute does not avoid all warranties, but only such as are not material to the risk. All matters warranted which are material to the risk are left just as they were before the statute.' And cited in support of this construction the construction of similar statutes in March v. Ins. Co., 186 Pa. St. 629, and Brown v. Ins. Co., 172 Mass. 498.

"The construction contended for by the plaintiffs would deny to fire insurance companies the right to limit the risk against which they would issue policies of insurance. That the storage of the explosives in the building by plaintiffs increased the risk and was a clear violation of the express provisions of the contract of insurance, admits of no doubt. By this act the policy was forfeited and the plaintiffs should have been nonsuited, unless there was a waiver of the forfeiture.

"There is nothing in the evidence tending to show any fact or circumstance by which a waiver can be inferred. No agent or officer of the company knew or had been informed of the storage of the explosives until after the fire.

"Plaintiffs refer to Greenleaf v. Ins. Co., 37 Mo. 25, and Obermeyer v. Ins. Co., 43 Mo. 573, as holding that defendant should be held liable on the policy, notwithstanding the violation of the contract by them. These cases, in effect, decide that where a fire or marine policy contains a provision for forfeiture on the

doing of a particular act by the insured and the insured violates the provisions by doing the act, but the company for any reason fails to take advantage of the forfeiture by cancelling the policy, and the thing done that effected the forfeiture ceased to exist or have any effect or influence on the risk insured against, and afterwards there is a loss during the life of the policy, the company cannot invoke the dead and past forfeiture as a defense.  The policy, in such circumstances, is inoperative only while the increased risk is in existence, and when it terminates the liability of the company will recommence.  [Schmidt v. Ins. Co., 41 Ill. 295.]  The increased risk in this case continued down to the fire and the policy for this reason was inoperative when the fire occurred.

"2.  Plaintiffs refer to a very nice point made and sustained by the Supreme Court of South Carolina in the case of Leggett v. Ins. Co., 10 Rich. Law 202.  The policy provided that the keeping of gunpowder for sale, or in storage, upon or in the premises insured, should render the policy void.  The insurance was upon a stock of goods and merchandise contained in applicant's store, a part of which consisted of gunpowder. But it was contended and held that the word 'premises' referred to buildings insured and as there were no buildings insured, the gunpowder was not kept upon or in the premises insured within the meaning of the stipulation.  The Leggett case is distinguishable from the one in hand.  In the South Carolina policy the clause construed reads as follows: 'The keeping of gunpowder for sale, or in storage, upon or in the premises insured,' etc.  The goods insured in the case in hand, were insured while located and contained in a one and one-half story brick building, with composition roof, situated on lots 14 and 15, block 15, street No. 143-145 West Olive street, Aurora, Missouri.  That part of the

205 Sup—20

prohibitive clause under review reads as follows: 'If illuminating gas or vapor be generated in the described building (or adjacent thereto) for use therein; or if (any usage or custom of trade or manufacture to the contrary notwithstanding) there be kept, used or allowed on the above-described premises benzine, benzole, dynamite, ether, fireworks, gasoline, quickfire, gunpowder exceeding twenty-five pounds in quantity, naphtha, nitro-glycerin or other explosives, phosphorus or petroleum or any of its products of greater inflammability than kerosene oil of the United States standard (which last may be used for lights and kept for sale according to law but in quantities not exceeding five barrels provided it be drawn and lamps filled by daylight or at a distance not less than ten feet from artificial light); or if a building herein described, whether intended for occupancy by owner or tenant, be or become vacant or unoccupied and so remain for ten days.' The intent and purpose of this clause is plain. The words 'building' and 'premises' are used interchangeably. The prohibition goes to the storage, or the keeping of the prohibited articles in the building where the goods insured were located. We are relieved of subtleties and fine distinctions in contracts of insurance under the laws of this State which require them to be construed like any other contract.

"3. Plaintiffs further contend that the case was tried upon a theory adopted by the defendant and it is thereby estopped to raise an objection to the action of the court in overruling its demurrer to the evidence and submitting the issues to the jury. It is a well-settled rule of practice in this State that where parties try a cause upon a certain theory, neither party can have the case considered on another and different theory in the appellate court. [Mirrielees v. Railroad, 163 Mo. l. c. 486, and cases cited.] But where, as was done in this case, the defendant, at the close of all the evidence, of-

fers a demurrer to the evidence as a whole, which the court refused to grant, and he saves his exceptions to the rulings of the court, the appellate court is required to review all the evidence heard on the trial and determine for itself whether or not there is substantial evidence in support of the verdict. [McPherson v. Railroad, 97 Mo. 253; Weber v. Railroad, 100 Mo. 194; Hilz v. Railroad, 101 Mo. 36; Jennings v. Railroad, 112 Mo. 268; Kerr v. Cusenbary, 60 Mo. App. l. c. 560; Flinn v. Bldg. Assn., 93 Mo. App. 444.]

"There is no substantial evidence in the record in support of the verdict; on the contrary, the evidence clearly shows beyond peradventure that the policy was inoperative at the time of the fire and the demurrer to the evidence should have been given.

"Judgment reversed."

Thereupon Judge Bland was of the further opinion that the third paragraph of the opinion rendered is opposed to the opinion of the Kansas City Court of Appeals in the case of Frankenthal v. Assurance Co., 76 Mo. App. 15, and the cause was certified here for determination in accordance with section 6 of the amendment made in 1884 to article 6 of the Constitution.

I. The proposition in the third paragraph is to the effect that where a defendant challenges plaintiff's theory of the sufficiency of all the evidence to make a case for plaintiff by submitting an instruction in the nature of a demurrer to the evidence at the close of the case, such defendant does not estop himself or waive his right on appeal to pursue his exception to the court's ruling on such demurrer by asking and receiving instructions the converse of those given for plaintiff. Is that proposition good law? Eminently so, because:

(a) In construing rules of appellate practice in accordance with right reason regard must be had to the difference between the position occupied by a de-

fendant and that occupied by a plaintiff. The plaintiff goes into court voluntarily; the defendant is *"lugged"* in, that is, pulled in by the lugs, *will ye, nill ye.* The plaintiff goes up to battle on his own ground—he pitches the field. The defendant by a plea in avoidance may undertake to flank plaintiff's position and select another battlefield. The trial court may parry the flanking operation and force defendant to join battle on the position taken by plaintiff. Having been thus coerced and having yielded, as he was in duty bound to yield (and because he could not help himself) how can it be said that, because he made the very best of a bad bargain and tried "to pluck the flower, safety, from the nettle, danger," he lost his right to complain of the court's ruling in coercing him?

In commenting upon this question, GANTT, J., in Cochran v. Railroad, 113 Mo. l. c. 366, said: "It must be remembered that a defendant occupies a different attitude from his adversary, the plaintiff. The plaintiff brings the action. If the ruling is adverse, he may take a nonsuit. Not so with the defendant. He is in court without his consent. The court may make any number of rulings that he may deem erroneous, but he cannot abandon the case; he is in court and must remain till the cause is finished. He has a right to tender as many defenses as he has. If the court erroneously deny him one, he must avail himself as best he can of those remaining. He, however, advises the court and his adversary of his claim, and if he submits, as he is bound to do, to the ruling of the court, and tries his case in accordance with its judgment, on what principle is he estopped from complaining of the action of the trial court and his adversary in forcing him to fight the battle upon ground selected by them and at a great disadvantage to him? We see no element of estoppel in such a case."

The reasoning in Barker v. Railroad, 126 Mo. l. c.

151, is to the same effect.  There BARCLAY, J., for this court In Banc, said: ''Nor can it matter, in the result, that the defendant's counsel, on cross-examination, asked the witness to repeat his account of the interview with the conductor.  That course did not amount to a waiver of the right to urge the exception already saved to the ruling of the court in admitting that interview.· Counsel might properly conform to that ruling for the purposes of the trial, without thereby waiving the right to review the admission of incompetent evidence that had come in, over his objection.  After that evidence was before the jury, he might then combat it, or meet it, as best he might, without waiving the exception already taken.  [Tobin v. Railroad, 18 S. W. 996; Martin v. Railroad, 103 N. Y. 626.]''

So, BRACE, P. J., in Donnell v. Wright, 147 Mo. l. c. 648, said: ''It is contended, however, that the plaintiff waived this bar by offering evidence and asking instructions on the issue submitted to the jury.  Had he voluntarily done so, this might have been the case, but as he was constrained to this course by the adverse rulings of the court he is not precluded from insisting on the error.''

And in Bailey v. Kansas City, 189 Mo. l. c. 513, it was said: ''It is further suggested by respondent that appellant cannot take advantage of said error, because, after the introduction of the evidence complained of, it proceeded on its own account to introduce evidence of the subsequent repairs and reconstruction of the sidewalk.  Of this suggestion suffice it to say that the participation in error by inviting it waives the right of subsequent complaint by the losing party on appeal. But the reason of the rule ought not to permit its application to a case where the losing party, as here, does not· invite the error, but yields under protest to the theory of the trial court and thereafter tries, as best he may, to ameliorate his plight by administering an antidote

to the poison already injected in the case, to see if, per-adventure, he may not be able to render it innocuous."

The reasoning of the cases cited by BLAND, P. J., in paragraph three is in accord with that of the foregoing cases and sustains the proposition in that paragraph.

Indeed, it was a favorite notion of writers on sprightlier themes than the law, commencing, maybe, with Aristophanes and coming on down through a line of wits, including Butler, Scarron and Goldsmith, that:

"For he who fights and runs away,
May live to fight another day;
But he who is in battle slain,
Can never rise and fight again."

Transmitting that notion into allowable law phrase, it might read thus:    He who fights and runs away from a position taken on his answer and at the trial, because *driven* away by the court, may live to fight another day on appeal in the same position, if he marked the spot by an exception; but he who is in bat-tle slain—that is, who selects his place voluntarily, and who legally (speaking in figure) dies in his tracks on his selected theory, can fight no more on appeal, because: (as once a mortgage, always a mortgage, so) once fair-ly dead, always dead.

(b)   The rule respondent invokes is the sensible common-place of the law that a case must be heard on appeal on the same theory it was tried below. That rule is constantly applied in many ways.   But care must be exercised to put one's finger on the theory upon which the case was tried.   What if there be *two* theories. May one be taken and the other left?   If a plaintiff and de-fendant   jointly select a theory and try their case on that theory, neither may stray from it on appeal.   If either litigant tole the court   into error,   the   one   to blame may not complain.   So, if plaintiff and defend-ant jointly tole the trial court into error, neither may

complain of that error on appeal. But it must not be forgotten that a defendant, in his defense, may have a quiver full of arrows, may be allowed more than one theory—may have two strings to his bow withal. For instance, his first theory may be that he is not liable as a matter of law on all the facts. His next theory may be that it is a question of fact to be put to the jury whether, under the evidence, he is liable on the issues put to them on plaintiff's theory of the case. Precisely so is the record in this case. By answer, by its course at the trial and by the mandatory instruction asked and refused, defendant insisted it was not liable on the facts as a matter of law. The trial court refused to go hand in hand with defendant on that theory; and defendant, adjusting itself to the court's theory, is not now estopped to reassert its first theory and waived none of its legal rights on appeal.

(c)  It was said by Justice WHITE in Hanson v. Boyd, 161 U. S. 1. c. 402, that: "There was no motion made at the close of the evidence to direct a verdict, and both parties therefore agreed to the submission of the issues of fact to the consideration of the jury. In the absence of such a request we must assume that there was sufficient evidence to warrant the court in permitting the jury to draw the inferences proper to be deduced from the evidence in the case."

In Hartford Ins. Co. v. Unsell, 144 U. S. 1. c. 451, it was said by Justice HARLAN: "The only ground for serious doubt in respect to the case is, whether the evidence was sufficient in any view of it to sustain the theory that the defendant had by its course of business with the assured led him to believe, and that he, in good faith, believed, that the company waived, as to him, a strict performance of the conditions as to the payment of dues or premiums, and whether if the court had given a peremptory instruction to find for the defendant, the verdict and judgment would have

been disturbed. But we need not consider the case in those aspects; for the defendant assumed that it would be submitted to the jury, and asked instructions touching the several points on which it relied. *It did not ask a peremptory instruction for a verdict in its behalf. It cannot, therefore, be a ground of reversal that the issues of fact were submitted to the jury.*"

It would seem from the foregoing that the highest court in the land looks upon a failure of appellant to ask a peremptory instruction as equivalent to assuming that the case was a proper one for the jury on the facts —a theory he is bound by on appeal. If this be good law, how can it also be good law that if appellant does ask a peremptory instruction and it is disallowed, he waives his right to challenge the ruling by asking the converse of respondent's instructions and thus, maybe, winning out on respondent's own theory? To so hold would be the same as to say that appellant waived his point by asking no peremptory instruction and (*mirabile dictu*) waived it by asking one. That is, he can stand on neither foot, and the last state of that man is worse than the first.

As we understand Frankenthal v. Assurance Co., 76 Mo. App. 15, the doctrine of that case is not necessarily in conflict with paragraph three of the opinion. In another case (Hopkins v. Modern Woodmen of America, 94 Mo. App. 402) the Kansas City Court of Appeals came nearer to a decision contrary to the third paragraph of Judge BLAND's opinion than in the Frankenthal case. [See p. 409.] In that case there was a peremptory instruction asked and it was held that a right to a review of the ruling, *nisi,* on that instruction, under the record before the court, was waived by asking other instructions. In a still later case (Eberly v. Railroad, 96 Mo. App. l. c. 367, *et seq.*) that court had under exposition the same question. It would seem from the ruling in the Eberly case that the Hop-

kins case rode off on a peculiar condition of the record
—a condition we cannot make out precisely. In the Eberly case the orthodox rule was announced that an instruction in the nature of a demurrer to the evidence
saves the point that there was no case to go to the jury
on the facts and law. But if in either of those cases
that court intended to say that the bill of exceptions
should show *the order* in which instructions were asked
or refused, and that there is vital significance in such
punctilio, then such ruling is of doubtful utility in arriving at ultimate justice. In strict logical order, if
defendant contends there is no case to go to the jury,
he should hand up his instruction in the nature of a demurrer first and at once at the close of the case, because, if that instruction be given there is no use of considering any other. But the practice is for both sides
to hand their instructions up to the judge at one and
the same time. Many trial judges require this to be
done so that the court may have them all under his
eye, may consider them by and large and pick and
choose as his judicial acumen may fortify his sense of
justice and prompt his action. We can see nothing material or vital in the mere order in which the instructions are asked or passed upon. They look alike
whether viewed from *a* down to izzard, or, *vice versa,*
from izzard up to *a.*

Moreover, the record in this case does not specify
the order in which the instructions were asked. Learned
counsel are supposed to know the law—are presumed
to be skilled in the rules of logical order and sequence
and to do their duty. Hence, in the absence of an abstract specifying the order in which instructions were
asked, as here, it would be presumed they were asked in
due order and sequence.

Respondents and appellant rebrief the case for this
court and respondents urge the view that appellant
waived its mandatory instruction when it participated

in asking instructions on the issues under plaintiffs' theory. There is no merit in the contention.

II.   We have gone over the record and considered the contentions pro and con. We find the statement adopted by BLAND, P. J., from appellant's brief to be lively, but fair. We find the doctrine announced by him sound. It would be a startling proposition if tons of dynamite and other forms of explosives would not be said to be "material" to an insurance "risk." No judge would have to take the opinion of twelve men on that point. There was no waiver shown by the evidence, and there was nothing to indicate that appellant was so foolish as to undertake to insure powder against *fire* under the head of "supplies." Plaintiffs grossly violated the ordinances of Aurora and the terms of the policy when they subjected the town to the hazard of destruction and when they, in a most inflamed way, subjected the defendant to the hazard of loss.

It would be improper, aye, impossible, to compress within the limits of a judicial formula what would be material to a risk under any and all circumstances. Danger lurks in generalization. It is well enough to decide the case at bar on the record before us; and on this view we have no hesitancy in agreeing with the conclusion of the St. Louis Court of Appeals, that, as a matter of law, plaintiffs avoided their policy.

The judgment of the circuit court is accordingly reversed.

All concur.